Laura Hills, Administratrix, v. S. W. McMunn et al.

### Gen. No. 13,139.

1. BILL IN EQUITY—*interest essential to maintain.* In order to maintain a bill in equity it must appear that the complainant has an actual existing interest in the subject-matter of the litigation.

2. SPECIFIC PERFORMANCE—*who cannot enforce.* A party cannot enforce the transfer of stock which he never owned or purchased and in regard to which he never made a contract. A privity of interest is essential to the maintenance of a proceeding for specific performance.

FREEMAN, P. J., dissenting.

Bill in equity. Appeal from the Circuit Court of Cook county; the Hon. OSCAR E. HEARD, Judge presiding. Heard in the Branch Appellate Court at the October term, 1906. Affirmed. Opinion filed July 9, 1907.

**Statement by the Court.** This is an appeal from a decree of the Circuit Court dismissing appellant's amended bill for want of equity, upon the close of complainant's evidence.

The substantial facts shown by the evidence in the record are as follows:

Albert H. Weber, one of the defendants to the bill, had organized a corporation under the laws of Arizona called "The Slick Steel Piling Company" with a capi-

tal of 5,000 shares of $100 each, for the purpose, it is said, of taking over United States Letters Patent No. 639,884, issued December 26, 1899, to Samuel K. Behrend, for an invention in the use of steel piling and making and selling steel piling thereunder. The corporation was simply a paper corporation, and had no money or property, and had never received anything for the 600 shares of stock which had been issued to Weber. Certificates for the other shares of stock had never been issued. Weber had represented to the directors of the company that he had acquired Patent No. 639,884 for steel sheet piling, and proposed to transfer to the company a three-quarters interest, subject to an indebtedness of $7,500 due June 15, 1904, for 4,995 shares of the capital stock of the company. Weber had an option contract for the three-quarters interest in the patent with Behrend for $6,000. The board of directors accepted this proposition and appear to have issued to him 600 shares of stock. The patent or any interest therein was never conveyed to the company.

Shortly thereafter in May, 1904, Weber entered into an agreement with Fred Hills, the complainant, whereby it was agreed that the complainant should use his best efforts to make a sale of 3,000 of the shares of stock of the Slick Steel Piling Company, and that in case he effected a sale, all the proceeds of the stock over and above what was necessary to secure the conveyance of the above patent to the Slick Steel Piling Company, and over and above what might be required by the terms of the sale to be placed in the company's treasury for working capital, should be divided equally between complainant and Weber, and that the remaining 2,000 shares of the stock of the company should be divided equally between them. This agreement was modified on August 17, 1904, as we shall state later.

In the latter part of July and in the early part of

August, 1904, Hills had several interviews with the defendant S. W. McMunn, appellee, for the purpose of inducing him to purchase some of this stock, and on August 9, 1904, Hills submitted to McMunn the following proposition:

"AUDITORIUM HOTEL, CHICAGO, ILLINOIS.
                                    August 9, 1904.
S. W. McMunn, Esq.,
    Chicago, Ill.

DEAR SIR: The Slick Steel Piling Company is a corporation organized under the laws of Arizona, with 5000 shares of $100.00 each, par value, and is the owner of U. S. patent No. 639884, under date of Dec. 26th, 1899, for steel piling, being the prior patent for this kind of product.

I will deliver you 3000 shares of this stock for $25,000 of which amount $15,000 is to be cash paid to me; the remaining $10,000 is to be placed in the Treasury of the Slick Steel Piling Company for operating expenses.

I make you this offer and will hold same open for ten days, when you will please report to me the progress you have made in Pittsburg, Pa.
                        Faithfully yours,
                                    A. H. WEBER."

Upon receiving the proposition Mr. McMunn caused an investigation to be made of the affairs of the Slick Steel Piling Company. This investigation disclosed that the representation as to the ownership of the patent, made in the proposition, was not true; that it was not the owner of the patent and that it had nothing in the way of property or money, and that it had never received anything for the shares issued to Weber.

On August 20, 1904, Weber and Hills went to McMunn's office and McMunn accepted Weber's proposition, dating his acceptance August 18th, in order to bring it within the period named in the proposition. The acceptance was in writing, as follows:

"CHICAGO, August 18, 1904.

"The above proposition is accepted by me. The payment of the sums above mentioned are to be made by me only when satisfactory evidence is presented to me that the Slick Steel Piling Company is a lawful corporation of the Territory of Arizona and duly and legally organized and when a good title to letters patent No. 639884, free and clear of all liens and incumbrances, is conveyed to said Slick Steel Piling Co., all of which must be done within 30 days from Aug. 18th, 1904, or this agreement shall be at an end and void, all of which is agreed to by A. H. Weber.

S. W. McMUNN.

404 Lakeside
Harrison 4348. Fred Hills.
A. H. Weber."

On the same day after signing the above McMunn loaned Weber $300 and took his note for it, upon Weber's statement that his wife was sick in California, and that it was necessary for him to go there.

Before leaving for California, Weber gave Hills two powers of attorney, both dated August 19, 1904. One of these authorized Hills "to ask, demand, sue for, collect, receive and give acquittance for all sums of money, debts and demands, whatsoever, which are or shall be due, owing or belonging to me, or be detained from me, or which I shall be entitled by reason of the sale and delivery of three thousand shares of the capital stock of the Slick Steel Piling Company to .......................... To sign, execute and deliver as my said attorney any and all instruments in writing that may be necessary or are required to make such sale and delivery, and to assign any and all certificates of stock of the Slick Steel Piling Company now issued to me, or that may be hereafter issued to me by said company in order to fully consummate said sale."

The powers conferred upon Hills by the other power of attorney were "to take the general control and management of my affairs and business in connection with

the Samuel K. Behrend patent steel piling, said patent being covered by letters patent and are numbered 639,884 and bear date the 26th day of December, A. D. 1899; and to take the general control and manage-ment of my affairs and business in connection with the Slick Steel Piling Company with full power to sign all contracts, instruments in writing of every kind, nature and description whatsoever, together with full power to receive and sign for, or deliver any and all certificates of stock, and do any and all things to fully consummate the delivery of said patent to the said Slick Steel Piling Company, and to fully consummate any and all things herein mentioned.''

Hills first learned from Weber on the afternoon of August 20th the ownership of the various interests of the Behrend patent. On the following Monday, August 22, 1904, Hills told McMunn that Weber had informed him on Saturday preceding how the various interests in the patent stood, and that it was very different from what he had expected; and that Samuel K. Behrend of Denver owned a three-fourths interest, which could be had for $6,000; that Geo. M. Eckels of Chicago, Mr. Behrend's attorney, held in escrow an assignment of his interest to the Slick Steel Piling Company; that a Mr. Cochran of Chicago owned a one-eighth interest which could be obtained for $1,500, and that Mr. Campbell of Pittsburg owned a one-eighth interest which could be purchased for $1,000. Hills also told McMunn that he had written a letter to Beh-rend with Weber's approval offering Behrend $6,000 for his interest, on condition that Behrend make the assignment to Hills or Weber; and that he also wrote Campbell offering to buy his interest. He also told McMunn that neither he nor Weber had any money, and that they could not obtain the money to purchase the interests in the patent; and that if McMunn wanted them he must pay the money for them himself. There-upon McMunn told Hills to go ahead and obtain those interests, and that he would take care of them.

Hills v. McMunn.

Between that date and August 31, 1904, Hills by correspondence and telegrams arranged with Behrend and Campbell to come to Chicago and have interviews with Mr. McMunn; and also arranged an interview between Cochran and McMunn, all for the purpose of purchasing their respective interests in the patent. These interviews resulted in the purchase by McMunn of the various interests at the prices above named. When Behrend's interest was purchased, Mr. Eckels, the attorney of Behrend, under instructions which he stated he had from Weber, to whom Behrend had given an option, refused to advise Behrend to make the assignment of his interest to anyone but Weber or Hills. McMunn was therefore obliged to take the assignment of Behrend's interest in Hills' name. In order to concentrate all the interests in one person, McMunn had the assignments from Campbell and Cochran also made to Hills; and on or about September 1, 1904, Hills at McMunn's request conveyed all the interests to James M. McConahey. At that time Hills did not know McConahey and he delivered the assignment to Mr. Bern, who was McMunn's private secretary. Hills had no conversation with and did not even meet McConahey at the time he made the assignment to him; and did not notify him of the assignment of the patent to him.

On September 5, 1904, complainant Hills entered into the employ of McMunn on an annual salary of $3,500, and remained in his employ for several months and until he resigned for the purpose of bringing this suit.

Between August 24, 1904, and September 28th following, Hills wrote Weber several letters relating to the business he had in hand. These letters were at the time called to the attention of McMunn, who knew their contents, and what the agreement was between Hills and Weber. In his letter to Weber dated September 3, 1904, Hills says: "I have worked hard and faithfully to accomplish the McMunn trade, and I appreciate

his goodness very much in standing by the matter as long as he has. * * * You undoubtedly know the state you left the deal in, the many complications surrounding it and possibly you realize, as I do, that it could not and cannot be carried out under your proposition of August 9th. Matters are not in shape even now so that I can write you fully, and in sending you this to-day it is simply to assure you that everything possible is being done to consummate matters."

In his letter to Weber of September 28, 1904, Hills writes: "I may as well be frank with you and tell you the status of the Slick Steel Piling Company was rotten. It had issued stock when it had no property to issue stock on. In fact it was issued simply on account of your holding an option on three-quarters interest of the Behrend patent at that time. As a business man and as Mr. McMunn has connected with him some of the strongest men in the country, it was essential that he proceed on purely business lines." The letter then proceeds to explain the decision of McMunn to organize a new company, and refers to his acceptance of the proposition of August 9th, and approves of the organization of the new company.

At this time McMunn had organized the United States Steel Piling Company, the final certificate of which was issued and received September 17, 1904. At the request of McMunn, McConahey conveyed all his interest in the patent, which he held as trustee for McMunn, to the United States Steel Piling Company and paid the company $10,000, for which he received a certificate of the entire capital stock of the company, which he held as trustee for McMunn. The money so paid was furnished McConahey by McMunn.

On September 10, 1904, Hills became ill, went to Mercy Hospital, Chicago, and remained there until September 23, 1904. While in the hospital he learned from a newspaper of the organization of the United States Steel Piling Company. When he got out of the

hospital, in conversation with McMunn he spoke of the new company, and McMunn said they would soon get things in shape for their first meeting, and nothing of importance was said between them.

As above stated the arrangement between complainant Hills and Weber was changed after the proposition was made to McMunn. On August 17, 1904, Weber made the following proposition to Hills in writing:

"CHICAGO, Aug. 17, 1904.

MR. FRED HILLS,
    Chicago, Ills.

After the $15,000 (Fifteen thousand dollars) is paid to me (deducting $500.00 (Five hundred dollars) as commission to be paid to you) for (3000) Three thousand shares of the Slick Steel Piling Co. you and I shall and will divide equally, on the remaining shares, after all expenses is paid, and our obligations satisfied. This contract being based on us being man and man. If either of us fails to fill this moral obligation, the court shall decide which is man.

This contract to remain in force as far as consummation of above deal, for and until Aug. 23d, 1904, providing one thousand dollars ($1000.00) shall be paid to me, to apply on expenses or purchase account, payable Saturday, 20th inst.

Truly yours,
A. H. WEBER.

I agree to above.

FRED HILLS."

This seems to have been the last contract between them. Hills never paid the $1,000 mentioned in the above contract.

October 25, 1904, Hills wrote McMunn demanding for Hills and Weber $15,000 less the cost of purchasing the patent and of incorporating the United States Steel Piling Company, and less the money advanced to Hills and Weber; also demanding 2,000 shares of stock of the company. McMunn replied to the letter denying any liability. About a month later similar

letters passed between the parties, and subsequently this bill was filed.

Weber has not appealed from the decree.

ISHAM, LINCOLN & BEALE, for appellant.

M. J. SCRAFFORD, for appellees.

MR. JUSTICE SMITH delivered the opinion of the court.

No question is presented by the record or in arguments of counsel as to the pleadings, or that the evidence offered by complainant is admissible under the amended bill of complaint. We do not find it necessary therefore to make any statement of the pleadings.

The case turns entirely upon the sufficiency of appellant's evidence to make a case for the relief asked by the amended bill.

The terms of the original contract between Weber and McMunn are admitted by the pleadings. Appellant necessarily contends, and it is the theory of the bill, that this contract was by agreement between Hills and McMunn modified by the substitution of the stock of the new corporation, United States Steel Piling Company, for the stock of the Slick Company named in the contract, and in all other respects as though the former company had been named in the contract in place of the Slick Company.

In the opinion of the court the evidence fails to sustain this theory or contention.

The evidence of this modification relied upon by appellant consists of Hills' testimony as to various conversations between himself and McMunn, all of which, with possibly one exception, took place after the contract was made. One of these conversations occurred August 17 or 18, 1904, in which McMunn is represented as saying in substance that the Pittsburg people who were interested with him did not like Arizona corporations and the word "Slick" was ob-

jectionable, and expressed a preference for an Illinois corporation. Thereupon Hills said to McMunn: "All right. If this thing is to go through, as it is, and you prefer an Illinois corporation, we will pay our *pro rata* of the incorporation charges of making a corporation under the laws of the State of Illinois out of the money that is coming."

The following week a second conversation occurred upon this subject, according to Hills' testimony, and he (Hills) said that United States Steel Piling Company would be a satisfactory name to him.

Hills says that during the week following the making of the contract he told McMunn that neither he nor Weber had any money, and that they could not obtain the money with which to purchase the interests in the patent, and if McMunn wanted them he must pay the money for them himself, and that McMunn told him to go ahead and acquire the interests and "we will take care of the thing as soon as we get meetings and get settlement and get a new corporation."

The fourth conversation is said to have occurred about September 1, 1904, when the assignments were lying in McMunn's safe. Hills testifies that he said to McMunn: "What are you going to do with these assignments?" McMunn replied: "You have no objection to putting them in trust?" To this Hills says he replied: "No, Mr. McMunn, with a good man, no, on condition that they shall be delivered either to the Slick Steel Piling Company or the new corporation that we may choose to name under the laws of Illinois." McMunn said: "Well, I will fix that."

In connection with these conversations it is urged that in support of the proposition that the agreement was modified, that the letters written in McMunn's office by Hills to Weber which were brought to the attention of McMunn and were criticised and changed by him, should be considered as confirmatory proof of the modification of the agreement.

Upon a careful review and consideration of the tes-

timony and proof on this point we find no agreement to modify the contract. The conversations prior to and on August 22, 1904, in regard to securing the various interests in the patent, and the inability of Hills and Weber to procure the money with which to purchase those interests, do not indicate a purpose or intention to change the agreement which Hills stated to McMunn that neither Weber nor himself could carry out. McMunn's statement that he would furnish the money does not show such a purpose. There is in these conversations no expression from which we can find any such agreement. There is no promise on McMunn's part to furnish the $15,000 and deliver to Hills or Weber 2,000 shares of stock in the United States Steel Piling Company, or the new company which was to be formed. Hills' testimony proves that McMunn paid to the holders of the various interests in the patent $8,500 and took assignments to Hills of these interests in trust for himself or the company which was to be formed and not in trust for Weber or the Slick Company or Hills, and that Hills understood this perfectly, for he without delay or objection transfers, at McMunn's direction, all interests which he had received to McConahey, a stranger to him, delivering the assignment to Bern, McMunn's representative.

The allegation of the amended bill, therefore, that McMunn advanced Hills that sum to apply on the $15,000 which was to be paid by McMunn to Weber under the contract between them, and that Hills immediately distributed the $8,500 among the owners of the patent, and that this was done under the modified or changed agreement, is not proved, and is not true.

The conversation which took place about September 1, 1904, does not, in our opinion, prove that McMunn agreed or expressed any intention to modify the agreement, as claimed. Hills testifies that in that conversation he consented to transferring the interests in the patent which then stood in his name to McConahey, as

trustee for the Slick Company or the new corporation, but he does not testify that any particular modification of the original agreement between Weber and McMunn was mentioned or agreed upon. He does not swear that McMunn agreed to anything in that conversation. The substance of that interview is that McMunn wanted the assignment made to McConahey, and Hills made it without objection. Hills' testimony to the construction which he placed on the assignment to McConahey, which the assignment itself does not warrant, is not proof of a fact or of an agreement.

The interview after Hills came out of the hospital does not, in our opinion, tend to prove a modification.

It is clear that McMunn and Hills never in the most informal way talked over a modification of the original agreement. It is therefore impossible for us from the testimony to find what the alleged modification was, or what the contract as modified provided, without making a new contract for the parties. This a court will not do. By its terms the contract expired on September 18, 1904, and it was never renewed or extended. Weber had failed to comply with its conditions on his part, and Hills never paid the $1,000 as provided in his contract with Weber of August 17, 1904, and therefore never complied with his contract with Weber.

The correspondence between Hills and Weber shows that not until September 28, 1904, when the contract had expired by its terms, did Hills inform Weber that any change was contemplated by the formation of the new corporation. His letter of that date first informs Weber of the organization of the United States Steel Piling Company. If there had been a modification of the contract, as contended, it is reasonable to suppose that Hills would have notified Weber at once and asked his consent to the change, but the record shows nothing of the kind. The consent of Weber to any modification was necessary before it would be effective or binding, for there was nothing in the powers of attor-

ney which Weber gave to Hills, before leaving for California, which conferred upon Hills the power to make any change in the agreement. We do not find any such consent or authority expressed in any letter from Weber to Hills in the record. There is in fact no reason to expect any such consent on the part of Weber, for we have searched the letters of Hills to Weber in vain for any such proposition or suggestion. As above stated, the letter of September 28, 1904, of Hills to Weber, contains the first mention of the new company. After commending the wisdom of the formation of this corporation, Hills in this letter says: "At this present moment, while we have had no meeting, I see no reason why and have heard no intention of Mr. McMunn insisting upon any change in our original offer, excepting of course that we shall have to pay the cost of the incorporation of the new company." This, we think, shows that Hills himself had no idea of any modification of the original contract at this date. It is not seriously claimed, we think, that any modification was made subsequently.

If the contract was not modified, or if it was modified as claimed, the question is, does the evidence show that Hills has an actual existing interest in the subject-matter of the suit, and is he entitled to institute a suit in equity against McMunn and the United States Steel Piling Company concerning it, asking for a specific performance of the contract?

No point is made in argument upon the fact that Hills' name appears attached to the acceptance by McMunn, in connection with Weber's name. It is not claimed that by appending his name to the acceptance, Hills made the contract his own or became a party to it. He did not own, nor was he selling the shares of stock in the Slick Company. Appending his name to the contract therefore had no legal effect. The contract was and remained a contract between Weber and McMunn. Before the contract was made Hills had no interest in the subject-matter of the contract.

After the contract was signed he still had no interest in the subject-matter of the contract. When the contract should be performed by the parties, Hills, by virtue of his agreement with Weber, would become interested as between him and Weber in a portion of the proceeds realized by Weber, if he had performed his agreement with Weber. But this possible right in certain proceeds did not vest him with that actual existing interest in the subject-matter of the Weber-McMunn contract and give him the proper title in the subject-matter of the contract which would enable him to institute and maintain a suit in equity concerning it. Enc. Pl. & Pr., vol. 3, p. 359, and case there cited.

In Story's Equity Pleading (9th ed.), par. 261, the learned author says, quoting from Mitf. Eq. Pl. by Jeremy, 155, 156: "Want of interest in the subject of a suit, or of a title to institute it, are objections to a bill seeking any kind of relief." And in the following paragraph the author says: "The bill, too, should not only show the title and interest of the plaintiff in the subject-matter of the suit; but there must be sufficient averments to show that the defendant also has an interest in the subject-matter and is liable to answer to him therefor. For it has been well remarked, that a plaintiff may have an interest in the subject of his suit, and a right to institute a suit concerning it, and yet he may have no right to call on the defendant to answer his demand. This may be for want of privity between the plaintiff and the defendant."

Whether the contract between Weber and McMunn remained as it was made originally, or whether it was modified by the substitution of the United States Steel Piling Company's stock for the stock of the Slick Company, it still continued to be a contract between Weber and McMunn, and not between Hills and McMunn. There was no privity between Hills and McMunn in either case, and therefore Hills has no

right to demand of McMunn a specific performance of the contract. Hills seeks by this bill to enforce the transfer of stock which, according to the evidence, he never owned or purchased, and in regard to which he never contracted with McMunn. Weber made a contract with McMunn for the sale of stock of the Slick Company, and under this contract or a modification of it, though not a party to it, Hills asks for a decree giving him stock in the United States Company which Weber never owned and never attempted to sell.

In our opinion appellant Hills is not entitled to the relief demanded in the amended bill and the Circuit Court did not err in dismissing it. The decree is affirmed.

*Affirmed.*

Mr. Presiding Justice FREEMAN, dissenting.

A three-quarter interest in the patent was held by Samuel K. Behrend, who had made an assignment of it to the Slick Steel Piling Company to be delivered on payment of $6,000. This assignment was held in escrow by Behrend's attorney in Chicago. The other quarter interest was held by two other parties who had agreed to transfer their respective interests upon payment of $1,000 to one and $1,500 to the other. Hills thereupon, with Weber's approval, arranged with Behrend to assign his three-quarters interest to Hills, procured the preparation of assignments conveying the other interests and told McMunn that neither Weber nor himself had $8,500 necessary to pay for these outstanding interests in the patent. Thereupon, after the assignments were executed in form approved by McMunn, the latter advanced $8,500 to apply, according to Hills' testimony, on account of the $15,000 to be paid Weber under the contract. The $8,500 was immediately paid over to the holders of the several interests in the patent, and assignments thereof were had to Hills, vesting in him the entire title to the patent.

There is evidence tending to show that McMunn objected to the name of the Slick Steel Piling Company and suggested to Hills that he would prefer to consummate the contract by substituting for said company a new corporation organized under the laws of Illinois, and suggested that the title to all the interests in the patent be assigned to Hills so that it could thereafter be assigned either to the Slick Steel Piling Company or such new corporation as the parties might thereafter determine, that Hills assented to this and it was agreed that such new corporation if formed should be capitalized at $500,000, with 500 shares at a par value of $100 per share, corresponding in all these respects with the organization of the Slick Steel Piling Company. This would enable the contract to be consummated in all respects, merely substituting the United States Steel Piling Company for the Slick Steel Piling Company in the contract mentioned.

Subsequently Hills at McMunn's request assigned the title to the patent to one McConahey by conveyance absolute in form, but, as Hills testifies, upon the understanding with McMunn that McConahey was to act as trustee and was to convey the patent either to the Slick Steel Piling Company or to the new corporation when organized, the money to be paid and the stock divided in accordance with the terms of the original contract. During this time Weber was informed of these transactions by letters which were written in McMunn's office by Hills and submitted to McMunn's approval before being mailed.

September 10, 1904, Hills became ill and was obliged to go to the hospital for nearly two weeks. While he was there McMunn caused the United States Steel Piling Company to be organized, with an authorized capital of $500,000, represented by 5,000 shares of stock, each of the par value of $100, corresponding in these respects, as above stated, to the Slick Steel Piling Company. The incorporators and subscribers were

persons in McMunn's employ. Immediately after its complete organization McConahey transferred to this new corporation the title to said patent. It appears that substantially all the stock was issued to McConahey, representing McMunn, as a consideration for such transfer, and McMunn now holds and controls most of the stock. He claims this stock as his own and refuses to comply in any respect with the original contract to pay Weber and Hills the $15,000 less the $8,500 advanced by him to pay for the outstanding interests in the patent and to transfer to them the 2,000 shares of stock corresponding to the amount to be retained by Weber and divided between himself and Hills, under the terms of the original contract.

The relief which appellant seeks is that defendant "McMunn be required to pay complainant one-half of said $15,000, less one-half of the advances heretofore made by McMunn on said sum," and also that he "cause to be transferred to complainant 1,000 shares of the capital stock" of the United States Steel Piling Company. The sole question presented is whether the evidence introduced in behalf of appellant is sufficient to support the allegations of the bill and warrant the relief sought. With the exception of one witness, McConahey, whose testimony is said to have been introduced for convenience before appellant rested, no proof was introduced by or in behalf of the appellees. None of the evidence in behalf of appellant is disputed. The original contract upon which appellant's claim is founded was in writing. The evidence tends to show that through Weber and Hills, defendant McMunn has received at least all that he would have been entitled to under the contract had it been literally fulfilled in accordance with its precise terms. He was to receive 3,000 shares of the Slick Steel Piling Company, "a corporation organized under the laws of Arizona with 5,000 shares of $100 each par value," which corporation was to become the owner of the Behrend

patent. Instead, he has received all the shares of United States Steel Piling Company, a corporation organized under the laws of Illinois, with the same capitalization of 5,000 shares having a par value of $100 a share, which corporation does own that patent. For conveyance of 3,000 shares of the stock of the company owning said patent he was to pay $10,000 into the treasury of the company. He has paid that sum into the treasury of the United States Steel Piling Company. By the terms of the contract, having undisputed notice before he signed it that complainant Hills "had a half interest in the proceeds of the contract" and that when they had "settled everything up" Weber and Hills "would divide equally," he agreed to pay to said Weber $15,000 in cash when a good title to the letters patent in controversy, free and clear of encumbrance, was conveyed to the Arizona corporation, which he knew had not then been done. The required good title to the letters patent has been conveyed to the United States Steel Piling Company substantially within the thirty days from date of the original contract. If the actual conveyance to the corporation was a day or so after the expiration of the thirty days, the delay was McMunn's and not complainant's. Substituting therefore the Illinois corporation for the Arizona corporation,—in substance a mere change of names and location,—defendant McMunn has received all he bargained for under the original contract, the other parties thereto having apparently in substance and equity complied on their part with the agreement.

It is stated in the answer of defendant McMunn that he "consented to purchase all interests, including the three-fourths interest held by Behrend for and on his, defendant's, own personal account." In view of the fact that this patent was so valuable that McMunn had agreed to pay $25,000 for it—$15,000 of that sum in cash to Weber and Hills—and that he was advancing only $8,500 of this latter sum to take up the options

which Weber had on the letters patent, McMunn has
not lost anything, at least, by this alleged "consent."
The evidence clearly tends to show that he succeeded
in getting the patent with the aid of complainant Hills
acting for himself and also for Weber under powers
of attorney. While McMunn advanced the $8,500 to
be used for the purpose of taking up Weber's options
or of complying with the terms of the arrangements
made by Weber to purchase the outstanding interests
in the patent, the assignments of these respective in-
terests were made to complainant Hills. There is evi-
dence tending to show the controlling interest at least
could not otherwise have been obtained. This McMunn
knew. The assignment of the three-fourths interest
made by Behrend to complainant Hills was prepared
by McMunn's attorney. The evidence is direct and
positive that McMunn had "desired the assignment
made out either to McMunn or someone for him," but
was told that under instructions from Weber this would
not be done. Hills testified that after receiving the
assignments made to himself he said to McMunn, "I
do not want to carry these things around—put them
away," and they were put in the safe in McMunn's
office, in which office Hills then had his headquarters.
Subsequently McMunn said to him, "You have no ob-
jection to putting them in trust?" to which Hills re-
plied, "No, on condition that they be delivered either
to the Slick Steel Piling Company or the new corpora-
tion that we may choose to name under the laws of
Illinois." To this he says McMunn responded, "Well,
I will fix that," and named McConahey as trustee, to
whom Hills accordingly assigned the patent at Mc-
Munn's instance. As McMunn had advanced $8,500,
it was doubtless reasonable that such assignment
should be made for his protection, pending conveyance
of the patent to the corporation. Subsequently, when
the United States Steel Piling Company was organ-
ized, McConahey assigned the patent to it in considera-
tion of its full capital stock of $500,000, par value,

and a payment to the company of $10,000 made by McMunn. McConahey testifies that in this he "acted for McMunn and transferred the stock as he asked me to."

It is claimed that the evidence tends to support appellant's contention that the transfer of the patent to the United States Steel Piling Company was not only in substantial compliance with the original contract as executed by McMunn, Weber and Hills, but in actual compliance with that contract as modified by a subsequent agreement between defendant McMunn and complainant Hills. Hills' testimony is explicit upon this point. He states that on five different occasions he and McMunn discussed the proposition to substitute a new corporation for the Slick Steel Piling Company mentioned in the original written contract, that McMunn objected to the name "Slick," that it was ultimately agreed between them that if McMunn chose to so decide the substitution of a new company might be made, and that it was made in accordance with such agreement. This testimony of Hills is corroborated by certain letters written by him from McMunn's office to Weber, which letters he testifies were scrutinized, criticised and "censored" by McMunn before being sent. He testifies that all these letters but one were written by McMunn's stenographer. In the letters Hills advises Weber of the progress being made. The tenor of the correspondence indicates that Hills and McMunn were proceeding in pursuance of the original contract. It was desired to have Weber assign the three-quarter interest in the patent to Hills, who in one letter promised to "assign it with the other two-eighth interests in one assignment to the Slick Company." September 20, 1904, Hills wrote that "the Behrend interest, as also those of Cochran and Mr. Campbell, have been paid for and were conveyed to me and are in the hands of a trustee until we have complied with all our promises." The letter of September 28, 1904, if examined and approved by McMunn,

as Hills testifies it was, is significant. In it Hills reminds Weber that in the original contract McMunn required "the good title of the Behrend patent should be established before any money was paid." He then proceeds as follows:

"After you left when I found out there were interests outside which had to be taken care of, and when Mr. Behrend appeared on the scene, Mr. McMunn was good enough to advance the money to pay for all these interests, all of which assignments were made in my name, and all of which were transferred to a trustee, who was to deliver to the Slick Company, or to another company, if it were found that the former was not legal.

"Mr. McMunn has decided to abandon the Slick Company and has incorporated a company under the laws of Illinois, by name the United States Steel Piling Company, with a capitalization of $500,000, and I look forward to a meeting of this company in a few days.

"It is needless for me to say that I consider this by far the best step, particularly as business men do not like the name of the word 'Slick,' which does not savor of integrity, and also on account of the Arizona incorporation, companies from which do not smell as sweet as the name above mentioned.

"At this present moment, while we have had no meeting, I see no reason why and have heard no intention of Mr. McMunn insisting upon any change in our original offer, excepting of course that we shall have to pay the cost of the incorporation of the new company.

"According to my agreement with you, I will equally divide with you every cent that you have paid out for this patent, and will divide with you the stock that I secure for our joint interest.

"Whatever stock we secure will be worth a great deal more under a live and pushing company than it would be with an ordinary corporation such as we might have been forced to form.

"I have no intention to do otherwise than to live up to my agreement, and as soon as I am in shape

to tell you exactly what we have, it will be for you to say whether you can accept or not. My advice to you is to trust implicitly to the man who pulled you through, and not to those who talk with their mouth.''

In these letters Hills was writing Weber in constant recognition of the latter's interest in the transaction under the original contract and expressing ''no intention of Mr. McMunn insisting upon any change in our original contract,'' except that Weber and Hills would have to pay the cost of incorporating the new corporation substituted for the Slick Company. Under this evidence the contents of these letters must be given the same force and effect, so far as they relate to McMunn, as if he had actually signed them. They state that the various interests in the patent assigned to Hills had been put in the hands of a trustee— McConahey—until ''all our promises'' had been complied with; that the trustee was to ''deliver to the Slick Company or to another company''; that McMunn had ''advanced'' the money to pay for the interests in the patent, not that he purchased them for his own personal account; that the Slick Company had been abandoned and the United States Steel Piling Company incorporated to take its place in the transaction; that there was no intention to change the original proposition; and that Weber and Hills were to have stock in the company.

It is argued in behalf of appellees that the powers of attorney from Weber to Hills did not authorize Hills to modify the contract and agree to the sale and delivery of any shares of stock of the new corporation, the United States Steel Piling Company. Whether so or not, this is not a matter of which appellees can complain, and no one else objects. Weber was informed of the substitution of the new corporation in place of the Slick Company and the reasons for it. He makes no objection and the other defendants cannot. It is urged there is no evidence of any contract to deliver to Hills and Weber 2,000 shares of the stock

of the new corporation and pay them the balance of
the $15,000. If, as there is evidence tending to show,
the new corporation was by agreement of the parties
substituted for the Slick Company and the contract
modified to that extent, its obligations were not thereby
changed or lessened. Nor was it necessary in order
to execute the contract in spirit and substance that
the shares of the new corporation should be issued
to Weber or Hills as a matter of form, and that they
should then deliver 3,000 shares of that stock to de-
fendant McMunn. It was immaterial by what precise
method McMunn should receive the 3,000 shares, nor
how Weber and Hills should receive the remaining
2,000 shares. That the new corporation was organ-
ized by McConahey for McMunn at the latter's in-
stance, instead of by Weber or Hills, is not a matter
of which McMunn can complain, nor of which he can
take advantage. The contract would be sufficiently
performed if all parties were put in the same situa-
tion as to the United States Steel Piling Company
that the original contract contemplated as to the Slick
Company. Equity will find no fault with the manner
of performance when there is performance in substance
and fact.

It is urged, however, in behalf of appellees that com-
plainant Hills is not shown to have had any interest
in the subject-matter such as to enable him to maintain
this bill. The undisputed evidence tends to show that
prior to the signing of the original contract Hills noti-
fied McMunn that he had a half interest in the pro-
ceeds of the contract and that when they settled he
and Weber would divide equally. That he had such
interest is evidenced by his signature to the original
agreement and is corroborated by the testimony of
Cooper that on August 20, 1904, Weber told him in
the presence of Hills that they were to divide the
money and remaining stock equally after the expenses
were paid. Before that time there had apparently
been an agreement, as indicated by the letter of August

17, 1904, that Hills was to receive a commission of $500 "for 3,000 shares of the Slick Steel Piling Company," after which they were to divide the stock equally. There is a subsequent reference to this commission in a letter from Hills to Weber dated September 5, 1904, in which he repudiates an apparent attempt on Weber's part to allow Hills only $500 as commission out of the $15,000 cash payment when made, without reference to the division of the stock. In that letter Hills said: "First of all I wish to say that my agreement with you is for an equal division as man to man and I shall make no other division." There seems never to have been any question as to their equal interest in the division of "the remaining shares after all expense is paid and our obligations satisfied," as expressed in the unfulfilled agreement referred to, which was to remain in force providing $1,000 should be paid "on expense or purchase account" on the twentieth of August. The money was not paid and it is said that agreement ended on that day, but it seems to have been superseded by the agreement testified to by Cooper, in accordance with which Hills and Weber were to divide equally in everything, share and share alike, after the expenses were paid.

It is, however, unnecessary to review in detail the evidence of Hills' equal interest as against Weber. Weber in his cross-bill asks only for one-half of the $15,000 cash payment provided for in the contract, less half of the $8,500 advanced thereunder by Mc-Munn, and for one-half of the 2,000 shares of stock of the United States Steel Piling Company claimed by himself and Hills. The evidence tends to show that whatever may have been the original relations of Hills and Weber under the contract with McMunn, in all the subsequent conduct of the transactions in controversy Hills acted and was recognized not as an employe of Weber's, but as an independent half owner with the latter in the contract in question, of which he was one of the original signers, the consideration

for his interest being the services he had rendered and continued to render to bring about the completion of the contract. As such half owner, Hills took the assignments of the various interests in the contract in his own name, acting for himself directly and for Weber under the powers of attorney, McMunn advancing the $8,500 necessary to pay for them. It is, however, unnecessary to define the exact nature of Hills' interest or how it was acquired. It was treated by all parties in the negotiations as of the same character as Weber's interest. But whether an actual or a mere beneficial interest in what Weber should be entitled to is immaterial, so far as concerned his right to maintain this bill. In Winkelman v. Kiser, 27 Ill. 20-21, it is said: "that the person holding the beneficial interest should be made complainant." In Elder v. Jones, 85 Ill. 384-387, it is said of one not made a party in a chancery suit, "He is the beneficial party and the suit should have been brought in his name." In Cameron v. Boeger, 102 Ill. App. 649-653, it is said: "In chancery suits are properly conducted in the name of the real parties in interest." In Smith v. Bates, 182 Ill. 166-169, it is said to be well settled "that a valid equitable assignment of part of a fund may be made before the fund is due or actually in being, providing it exists potentially," and courts of chancery always have jurisdiction to enforce trusts. "It is a familiar rule that equity disregards mere forms and looks to the substance in the application of equitable principles." Beal v. Harrington, 116 Ill. 113-122.

McMunn did not rescind the contract when he learned the ownership of the patent was still outstanding, and that Weber had merely an option. On the contrary he waived whatever right he might have had to do so, and induced Hills to proceed with the understanding on the part of the latter that its terms and conditions were to be complied with as modified by the substitution of the new corporation, the United States Steel Piling Company, for the Slick Steel Piling Company.

McMunn ought not, therefore, to be "allowed to go on and derive all possible benefits from the transaction and then claim to be relieved from his own obligations by a rescission or a refusal to perform on his part. If after discovering the untruth of the representations he conducts himself with reference to the transaction as though it were still subsisting and binding, he thereby waives all benefit of and relief from the misrepresentations." Day v. Fort Scott Inv. Co., 153 Ill. 293-305.

For reasons thus indicated I am unable to concur in the views expressed in the majority opinion.